UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 3:13CR81(MPS) |
| | : | |
| AMANDA C. BOWDEN | : | September 16, 2013 |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Amanda C. Bowden faces sentencing after having pled guilty to a hoax/threat charge in violation of 18 U.S.C. § 1038(a)(1), which was based upon an extensive and extremely serious pattern of threatening communications.  In sum, over a period of several days, the defendant expressed to both a civilian witness and a federal undercover agent, a passionate desire and highly detailed plans to commit a suicidal mass shooting and bombing at Gateway Community College in New Haven, Connecticut, explicitly comparing her goal to that of Adam Lanza, the perpetrator of the Sandy Hook school massacre in Newtown, Connecticut.  The government strongly believes that public safety requires the imposition of the maximum sentence consistent with the terms of the plea agreement, specifically, one year of incarceration to be followed by three years of closely supervised release, the latter to include mandatory psychiatric evaluation and psychotherapy, life-skills and parenting training, internet activity monitoring, and the maintenance of either employment, supervised job-search efforts, or continued education.

## I.    The Offense Conduct and Charges

The Government agrees with and adopts the description of the offense conduct as set forth in the July 31, 2013, PSR at pp. 7-13, ¶¶11-34, and respectfully requests this Court to adopt the factual findings of the PSR.

The defendant has objected to the inclusion in the statement of offense conduct of what are now paragraphs 22-33 of the PSR, asserting that "as a matter of law . . . post-offense conduct is not relevant to the offense itself and is prejudicial."   Defendant's July 30, 2013 letter to Probation Office at 1.   The government recognizes that, for the discrete purpose of determining the sentencing guidelines offense level based on "relevant conduct" as defined by USSG § 1B1.3, the defendant appears to be correct that post-offense conduct would fall outside the pertinent definition.[1]   But the scope of relevant conduct under section 1B1.3 is a non-issue here, because neither the government nor the Probation Office is seeking any adjustments to the offense level based on the facts set forth in the disputed paragraphs of the PSR.

At the same time, the facts set forth in the disputed paragraphs *are* relevant and material to the Court's fashioning of an appropriate sentence under 18 U.S.C. § 3553(a), which specifically directs courts to consider, "in determining the particular sentence to be imposed," not only "the nature and circumstances of the offense," but also such factors as the following: "the history and characteristics of the defendant"; "the need for the sentence . . . to reflect the seriousness of the offense, . . . promote respect for the law, and . . . provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the

---

[1]   The applicable, relevant conduct definition is set forth in Sentencing Guidelines Section 1B1.3(a), which provides in pertinent part:

> [T]he base offense level . . . specific offense characteristics . . . [and] adjustments in Chapter Three, shall be determined on the basis of . . .
>
> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . .
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . .

defendant"; and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment . . . ."   In light of this statutory directive, several appellate decisions have recognized that post-offense conduct – both good and bad – is highly relevant to the sentencing decision.   See, e.g., Gall v. United States, 552 U.S. 38, 43-44, 53 (2007) (district court did not err in imposing probationary sentence, based in part on "Defendant's post-offense conduct, especially obtaining a college degree and the start of his own successful business"); United States v. Chu, 714 F.3d 742, 747-48 (2d Cir. 2013) (district court did not err in denying downward adjustment for acceptance of responsibility to defendant who "attempted to commit a [drug smuggling] crime before being sentenced"); United States v. Boss, 493 F.3d 986, 987-88 (8th Cir. 2007) (district court's sentence "was a reasonable application of the § 3553(a) factors," taking into account, among other things, defendant's "postoffense rehabilitation including voluntary termination of drug use and enrollment in college coursework"); United States v. Guzman, 282 F.3d 177, 184-185 (2d Cir. 2002) (district court did not err in denying downward adjustment for acceptance of responsibility, "[g]iven the record of Guzman's post-plea conduct"); United States v. Woods, 927 F.2d 735, 736 (2d Cir. 1991) ("[W]e believe that the totality of Woods' post-plea behavior provided an adequate foundation for the sentencing court's skepticism regarding the sincerity of Woods' purported acceptance of responsibility.").

As noted, the government does not seek any offense level adjustments based on the disputed fact paragraphs in the PSR.   But those facts are highly relevant to the determination of an appropriate sentence, and should be considered for that purpose.

- 3 -

II.   **The PSR Properly Calculated the Defendant's Guidelines Sentencing Range.**

The government agrees with and adopts PSR's calculations at pp. 14-15 and 24-26, ¶¶37-48 and 84-97.   Specifically, under the applicable sentencing guideline section, 2A6.1, the base offense level is 12, and there is a two-level downward adjustment for acceptance of responsibility, for a total offense level of 10.   Because the defendant has a criminal history category of I, the resulting sentencing ranges are 6 to 12 months' incarceration under "Zone B" of the sentencing table, one to three years of supervised release to follow any term of imprisonment, a fine range of $2,000 to $20,000, and a $100 mandatory special assessment.

III.   **The Maximum Sentence Consistent With the Plea Agreement -- of One Year's Incarceration Followed by Three Years of Closely Supervised Release -- is Appropriate, Fair, and Accomplishes the Purposes of 18 U.S.C. § 3553(a).**

Under United States v. Booker, 543 U.S. 220 (2005), as elaborated by United States v. Crosby, 397 F.3d 103, (2d Cir. 2005), the Courts are directed first to determine the applicable sentencing guidelines range, then consider whether a departure from that Guidelines range is appropriate, and finally, assess the Guidelines range "along with all of the factors listed in [Title 18] section 3553(a)" to determine the sentence to impose. Crosby at 112-13.   "[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."   United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006).

18 U.S.C. § 3553(a) identifies the following "[f]actors to be considered in imposing a sentence":   (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the

public from the defendant, (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.   The United States submits that a sentence of one year's incarceration followed by three years of closely supervised release faithfully reflects and implements these considerations.

1.    Nature and circumstances of the offense, and history and characteristics of the defendant

The government regards the offense conduct as extremely serious, despite the facts that the mass-killing threats had not been carried out, and – contrary to defendant's assertions – she had not yet acquired firearms or explosives to carry out the threats.[2]   As discussed below, the evidence compellingly supports the conclusion that the defendant had a clear intention to carry out her stated plans, and that an enormous human tragedy was most likely averted because of the fortuitous, early discovery and interception of the defendant's plans.   This is why the government seeks the maximum period of incarceration and subsequent supervision under the plea agreement.

The pertinent evidence consists of several layers, including:   the frequency, intensity, and obsessiveness of the defendant's expressed desire to carry out a suicidal mass shooting and bombing at Gateway Community College; the defendant's repeated, sociopathic expressions of pleasure from the imagined suffering of her intended shooting/bombing victims; the detailed and

---

[2] The applicability of the hoax/threat charge was based on these facts, *viz.*, that at the time of the search warrant, neither weapons nor explosives were found in the defendant's possession, contrary to defendant's texts and statements that she already possessed, and was ready to deploy, firearms and explosives against Gateway Community College.   As discussed herein, the government believes that had the FBI not learned of the defendant's expressed desire to carry out the mass shooting/bombing, she would have continued to make plans and seek out co-perpetrators, weapons, and explosives.

thoroughly researched nature of her plans; the defendant's expressed interest to another person about obtaining training in and access to firearms; and the long history of defendant's explosive, violent temper directed at family members and neighbors.

As summarized in the plea agreement's Stipulation of Offense Conduct, and as much more fully described in the PSR, see 7-11, ¶¶14-24, between February 5, 2013, and February 17, 2013, the defendant's communications with a cooperating witness ("CW") and then an undercover FBI agent manifest a singular and most disturbing obsession with carrying out a mass murder of innocent students and staff members at Gateway Community College.   Especially concerning are the defendant's repeated expressions of pleasure and laughter that accompany her discussions of the shooting/bombing plans.   The following text messages by the defendant are representative:

- 02-06-2013:   "I feel like I can't wait any longer to do what I want to do I can't wait it's going to be fun . . . If y don't do it with me ill be all over the news ill be famous haha"; a few minutes later defendant added, "We have to plan it more to make it better then the rest. And make sure they die and not have stupid injures . . . ."   PSR, ¶17.

- 02-07-2013:   "I love the power Ill have over people . . . Then be in the news after all over the Internet ad dumb ass people will be like 'why did this happen' . . . Just thinking about it makes me happy . . . I love the feeling even though ill be dead f–ck it."   PSR, ¶18.

- 02-07-2013:   "I want the whole place to just explode lmfao (laughing my f—cking ass off) wouldn't that be funny . . ."   PSR, ¶19.

- 02-07-2013:   Asked by the CW, "How many lives do you think will be in our hands," defendant replied, "Hundreds hopefully with a bomb," then later adding, "Best way to go out . . . Cuz I hate people . . . I drew parts of the school out as to where to go first and the timing of it all . . . We will be killing people and ill be so happy haha . . ."   PSR, ¶19.

- 02-16-2013:   "I have dreams about shooting up my school . . . Yea you're with me it's amazing like there's all news outside and cops ad it feels so good killing people we are having the time of our lives doing it lol. Then kill ourselves an I wake up pissed cuz I want it to happen."   PSR, ¶23.

That the defendant actually intended to carry out the mass shooting/bombing is further evidenced by her attention to logistical details, her extensive research about prior mass shootings, and her efforts to obtain assistance regarding shooting skills and weapons acquisition.  Among the logistical considerations discussed by the defendant were "locking doors [before] killing everyone," to "[m]ake it hard for police to get in" (02-05-2013), PSR, ¶15; the need to "shoot a cop" and "to bomb it first . . . . hopefully wiping out some security" (02-17-2013), PSR, ¶19; telling the U/C they "should have bullet proof vests like [Adam] Lanza" (of the Newtown/Sandy Hook shooting), to "make it harder for the police to kill us during the shooting at Gateway" (02-13-2013), PSR, ¶21; reiterating to the U/C that she planned to detonate napalm bombs during the shooting, to prevent law enforcement from making entry and give her more time to inflict casualties (02-14-2013), PSR, ¶22; telling the U/C that, like Adam Lanza, she would destroy her computer and cell phone before the attack, to prevent law enforcement obtaining information from them (02-17-2013), PSR, ¶24; and discussing the infrastructure at Gateway Community College, stating there would be nowhere to hide (02-17-2013), PSR, ¶24.

The defendant also claimed to have constructed a napalm bomb, and provided a specific description of how she made it:   "gasoline, styrafoam mix the styrafoam until it turns into a jelly fill a glass bottle with the napalm then code the rag in napalm put it in the bottle leave a piece of the rag hanging out then light when you want to throw it at something" (02-12-2013), PSR, ¶20.  An FBI Special Agent Bomb Technician advised that the defendant had described precisely how to make a napalm bomb, hence confirming that she had successfully researched the topic.  Id.

A snapshot of the internet search history from the defendant's smart phone for just three days – February 16-18, 2013 – further reveals the extensive and obsessive focus of her research regarding mass murders.  On February 16, 2013, she visited numerous websites concerning the

Columbine, Colorado school shooting, including *twenty-six* separate visits to a single Youtube video titled "Columbine: A Psychological Case."   PSR, ¶31.   That same day, the defendant conducted web searches for "gun apps" and "shooting range app," and downloaded "iPhone gun apps" and "Shotgun Free" to her smart phone.[3]   On February 17, 2013, the defendant conducted an internet search for "does gateway community college have metal detectors," and conducted *eight* separate searches for the topic "virgina tech massacre".   She also visited numerous Youtube video sites about the Columbine, Virginia Tech, and Newtown/Sandy Hook massacres, including among others:   *eleven* separate viewings of the video "Columbine survivor's stories – RARE"; and *five* separate viewings of the video, "Inside Norris Hall," a building at Virginia Tech.   PSR, ¶32.   On February 18, 2013, the defendant conducted further searches regarding the Virgina Tech and Columbine shootings, including a search for "eric harris and dylan kleobold tribute video" (referring to the two Columbine shooters).   She also researched "what would it feel like to shoot you in the head" and "If you shot yourself in the head, do you die instantly?"   PSR, ¶33.

The defendant's inclinations were also suggested by a telephone text exchange with another individual in late December 2012 and early January 2013.   On December 26, 2012, defendant texted that she "always wanted to learn" how to shoot a gun, to which her texting correspondent ("TC-1") replied, among other things, "yeah sure what would you like to learn?" Defendant texted back, "How to shoot more accurately," to which TC-1 replied, "I can deffinatly help you with that."   On January 4, 2013, TC-1 texted "I promise you will know how to kill with any firearm . . . ."   The next day, defendant texted TC-1, "I want to shoot one day with you".[4]

---

[3]   The web searches and downloads are referenced in an FBI Form 302 report that was produced in discovery on April 18, 2013.

[4]   These text exchanges were produced to defense counsel and Probation on July 24, 2013.

As for the history and characteristics of the defendant, the facts reveal a severe lack of adult-level functionality; prolonged alcoholism; a pattern of rageful, threatening, and violent outbursts; and repeated failures of prior mental health interventions.   Contrary to the defendant's post-arrest assertion that "she was not actually planning any shooting or bombing," PSR, ¶25, this fact matrix reinforces the impression that her stated intentions in the offense conduct were indeed serious and dangerous.   Prior to her arrest, the defendant lived at home with her mother, neither attending school nor employed in any manner.   Although a mother of two children, the defendant largely neglected both of them, leaving nearly all of the child care and `nurturance to, respectively, the family of the older child's father, and her mother and sister caring for the infant.   PSR, ¶¶30, 63, 64.   It appears that the defendant was filling much of her time consuming or inebriated on alcohol, PSR, ¶¶66, 68-69, and indulging and cultivating her violent obsessions online, see above and PSR, ¶25, 31-33.

The defendant's closest family relationships – with her mother and sister – appear to involve a long history of conflict, with the defendant frequently arguing with, fighting with, or threatening them – including threats to kill.   PSR, ¶¶27, 29-30, 72.   The defendant's pervasive, simmering rage is further reflected in a journal that she kept, which was seized during the February 19, 2013, search and arrest at her mother's residence.   In the journal, she vented "anger and frustration at individuals who do not want to spend time with her, and who judge her."   PSR, ¶26. The defendant's outsized rage leaps from the pages, as in the following excerpts:

> I just want to tear their f—cking god damn faces off and make them suffer the way I have suffered from all the ridicule they put me through.   I need some type of revenge on these mother f—ckers . . . someday I might actually go through with the plan I have in my head and that is to kill every mother f—cker that EVER gave me and put me through hell . . .
>
> . . .

I just have so much anger and range [sic] in me I'm like a ticking time bomb reddy
to explode.

PSR, ¶¶26-27 (emphasis in original).   Especially revealing is her declaration, "its their fault I'm
like this today the angry person I am":   completely absent is any sense of her own role in the
alienation and unhappiness she experiences.   The defendant's well-documented rage spilled over
in violence against a neighbor less than six weeks before the offense conduct began, specifically,
the defendant shot at a neighbor's house several times with a BB gun, after which the defendant
bragged about the shooting on her Facebook page, and threatened to kill the neighbor's dog.
PSR, ¶¶27-28.

Finally, the intractability of the defendant's violent mental state is indicated by the fact that
several previous mental health interventions have failed to bring any relief, other than a brief
interval on Zoloft while the defendant was pregnant – which prescription she promptly and
adamantly terminated, even as she grew angry and resumed threatening her mother's life, and
despite her mother's requests that she remain on the medicine.   PSR, ¶¶29, 62, 72-73.

2.      Need for sentence to promote respect for law, specific & general deterrence, to
protect the public, and provide defendant with needed training, care, and
correctional treatment

The United States submits that, for all of the above-captioned policy reasons, the maximum
sentence under the plea agreement should be imposed, that is, a full year's incarceration followed
by three years of intensively supervised release, the latter to include mandatory psychiatric
evaluation and psychotherapy, life-skills and parenting training, internet activity monitoring, and
the maintenance of either employment, supervised job-search efforts, or continued education.

First, as a matter of both specific deterrence and respect for law, the defendant is greatly in
need of a strong wake-up call, one of sufficient gravity to trigger a fundamental change in her

- 10 -

highly destructive life path.   It is clear from the PSR that the defendant has for years occupied an alternative mental reality, in which she has cultivated an explosive rage against the world and wreaked havoc on her family and children, all the while blaming her misery on anyone and anything other than her own destructive choices and oppositional conduct.   This alternative reality is sadly evidenced by the defendant's description of herself to the probation officer as someone who is "smart, very caring and loving . . . [and] typically generous," and one who "loves to set and achieve goals."   PSR, ¶79.[5]

Even now, it is far from clear that the defendant fully appreciates the gravity of her offense conduct:   incident to her arrest, she denied that she was actually planning any shooting or bombing, PSR, ¶25; and weeks later, when interviewed about the offense conduct by the probation officer, she offered no more than that she was depressed at the time, but that "I honestly don't know what I was thinking."   PSR, ¶35.   This lack of insight and of honest self-accounting suggests that only with very strong incentives and a great deal of work will the defendant have a chance of growing beyond her present, destructive mind-set.[6]

Accordingly, it is the government's belief that an effective sentence in this case must begin with a serious term of incarceration.   Then, both to assure the public safety and for the well-being of the defendant, the supervised release period needs to be long and thorough.   Psychiatric evaluation is critical, as well as a long course of therapy, which will need to include learning some

---

[5]   See also PSR, ¶30 (defendant's mother describing the defendant as having "become more detached from reality and her responsibility as a mother").

[6]   Defendant's readiness to engage constructively with a therapist is also unclear.   In one of her text exchanges with the FBI U/C, she described a home visit by the Department of Children and Families, during which "They gave me a list of questions and I lied about a lot of things it was like 'did you ever think of committing suicide or hurting someone else' I put never lmao ("laughing my ass off") I was trying not to laugh while filling them out."   PSR, ¶23.

basic, adult parenting and life skills.   Active efforts to become self-sufficient are also needed, in the form of employment or supervised job-search activity, and/or educational/skills training.

Equally important, the defendant needs to be placed on an appropriate regime of internet and telephone usage monitoring.   Such monitoring, if narrowly tailored for an appropriate, case-specific purpose, has been upheld by the courts in a variety of cases where internet use facilitated the commission of the crime.   See United States v. Lifshitz, 369 F.3d 173, 189-90 (2d Cir. 2004) (in child pornography case, holding that "the 'special needs' of the probation system may render a computer monitoring condition reasonable," so long as the "monitoring condition [is] narrowly tailored, and [does] not sweep so broadly as to draw a wide swath of extraneous material into its net"); see also United States v. Stergios, 659 F.3d 127, 134-35 (1st Cir. 2011) (in fraud case, affirming supervised release condition of participation in computer internet monitoring program, because defendant "relied heavily on the internet to perpetrate his frauds"); United States v. Sales, 476 F.3d 732, 734-35 (9th Cir. 2007) (in counterfeit case where defendant scanned digital images of U.S. currency, holding that "[a] computer monitoring condition in some form may be reasonable," although particular condition imposed was found to be overbroad); United States v. Miller, 2013 WL 2631308, 2 (5th Cir. June 12, 2013) (unpublished) (finding that a computer restriction and monitoring program "reasonably relates to [defendant]'s prior conviction for sending threatening emails and the need to deter [defendant] from threatening others"); cf. United States v. Legg, 713 F.3d 1129, 1133-34 (D.C. Cir. 2013) (in sex travel act case, approving "one-device limit," that is, limiting defendant to possession of only one internet-capable device, to facilitate effective monitoring of defendant's internet activity).

3 & 4.    <u>The kinds of sentences available</u> / <u>The sentencing range set forth in the guidelines</u>

The recommended components of the sentence are all available within the applicable sentencing guidelines range, and under applicable case law precedent.

5.    <u>Policy statements issued by the Sentencing Commission</u>

The government is not aware of any policy statements pertinent to this sentencing.

6.    <u>The need to avoid unwarranted sentencing disparities</u>

The government believes that only the highest sentence available under the plea agreement is commensurate with the especially serious offense conduct described herein.

7.    <u>The need to provide restitution to victims</u>

This factor is not applicable in the instant case.

<u>CONCLUSION</u>

For all of the foregoing reasons, the government respectfully recommends that the Court impose the maximum sentence consistent with the terms of the plea agreement, specifically, one year of incarceration to be followed by three years of closely supervised release conditions, to include mandatory psychiatric evaluation and psychotherapy, life-skills and parenting training, internet activity monitoring, and the maintenance of either employment, supervised job-search efforts, or continued education.

Respectfully submitted

DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY

/s/ Henry K. Kopel
_____
HENRY K. KOPEL
ASSISTANT UNITED STATES ATTORNEY
Fed. Bar No. ct24829
157 Church Street, 23d Floor
New Haven, CT   06510
(203) 821-3700

- 14 -

## **CERTIFICATE OF SERVICE**

      I hereby certify that on September 16, 2013, I filed a copy of foregoing pleading, and caused copies of same to be served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.   Parties may access this filing through the Court's CM/ECF System.   Copies of the foregoing pleading have also been sent directly by e-mail to counsel for defendant, Kelly M. Barrett, Esq., E-mail Kelly_Barrett@fd.org, and to United States Probation Officer Megan Chester at Megan_Chester@ctp.uscourts.gov.

                                /s/ Henry K. Kopel

                              _____

                                Assistant U.S. Attorney